# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

J.V. A MINOR, BY HIS NEXT FRIEND,
LIZBETH ORTIZ, HIS MOTHER,

        Plaintiffs,

-vs-                         Case No.  6:04-cv-1889-Orl-28JGG

SEMINOLE COUNTY SCHOOL BOARD,
KATHLEEN MARY GARRETT,

        Defendants.

## ORDER

The sad allegations of this case, and its two companion cases,[1] are that Defendant, Kathleen Garrett, while serving as a teacher of autistic students, engaged in a pattern of abuse directed at the group of particularly vulnerable children entrusted to her charge. Defendant's conduct gave rise to criminal charges in state court and a conviction on one count of child abuse.[2]   In this case, Defendant faces a claim for violation of 42 U.S.C. § 1983 (Pl.'s Am. Compl., Count I), and supplemental state law claims of assault (Count III), battery (Count IV), and intentional infliction of emotional distress (Count V).  Other claims are asserted against Defendant Seminole County School Board.

---

[1] J.A. ex rel. Abelove v. Seminole County Sch. Bd., No. 6:05-cv-975 (M.D. Fla. filed June 30, 2005); A.B. ex rel. Baez v. Seminole County Sch. Bd., No. 6:05-cv-802 (M.D. Fla. filed May 27, 2005).

[2] During the state criminal proceedings, Garrett faced three counts of child abuse and one count of aggravated child abuse.  The court entered judgments of acquittal on two counts; the jury acquitted her of one count and found her guilty of the other.

Before the Court is Garrett's Motion for Summary Judgment (Doc. 79), a Memorandum in Opposition (Doc. 96), and J.V.'s supplemental briefing addressing Garrett's recently-taken deposition.  (Doc. 162.)  Having considered the parties' submissions, the record evidence, and applicable case law, Defendant's Motion for Summary Judgment must be denied.[3]

### I. Background

For the 2003-04 school year, South Seminole Middle School implemented a "co-teaching" model for its Exceptional Student Education ("ESE") program.  Under this model, J.V., an autistic child, spent half of his day with Lisa Callovi and half of his day with Garrett.  J.V. continued to spend part of his days in Garrett's classroom until October of the 2004-05 school year, when Garrett was removed from the classroom.  Garrett abused and intimidated J.V. while he was under her care by striking him, by bending his thumbs backwards, and by causing him to witness the abuse inflicted upon his classmates, which ran the gamut in severity from earlobe flicking (Mort Dep. 45:5-11, July 26, 2005) and provocation, (Nowik Dep. 55:10-56:21, Apr. 4, 2006), to slamming a child onto a desk, positioning his neck over the desk's edge, and applying the full force of her weight against his body until he began to turn purple and his eyes bulged from his head (Rodriguez Dep.

---

[3] Plaintiff argues that procedurally, Defendant's motion for summary judgment should be dismissed as untimely because the dispositive motion was four days after the filing deadline. (Doc. 96 at 3.)  Though there is authority for that course, see Dedge v. Kendrick, 849 F.2d 1398 (11th Cir. 1988), the motion was only four days late and it is properly denied on the merits.  Plaintiff also suggests that an adverse inference should be drawn against Defendant for invoking her Fifth Amendment right against self-incrimination.  (Doc. 96 at 4-5.)  Even if there is support for drawing such an inference, it is not necessary to do so in order to deny the motion for summary judgment.

24:12-19, July 26, 2005; Mort Dep. 55:10-56:21; see also Tacher Aff. ¶ 8).[4]  J.V.'s behavior deteriorated beginning in early 2003 – prior to his placement in Garrett's classroom – and worsened through the fall of 2003 after the "co-teaching" concept started.  His significant behavior problems caused him to be medicated so that he was over-sedated, which led to his rapid and considerable weight gain.  (Ortiz Aff. ¶ 18; Keeley Dep. 40-67, June 5, 2006.)

Garrett admits she hit J.V. once but maintains it was an accident.  She gave two contradictory accounts of the incident.  In her summary judgment memorandum, she claims that she hit J.V. while trying to redirect him when he was misbehaving.  (Doc. 79 at 3-4, 18.)  In her deposition, Garrett says that she hit J.V. accidentally while "roughhousing," or playing forcefully, with him.  (Garrett Dep. 200:2-5; 204:11-205:4, Feb. 15-16, 2007.)  During the deposition, Garrett specifically denied the justification that she previously set forth in her summary judgment motion.  (Id. 124:13-20.)  Jennifer Rodriguez and Sabrina Mort,[5]

---

[4] "Ms. Garrett had a child in a desk, and she had him leaning over the desk where his neck was coming across the crease on the end . . . . She laid her body on top of him and pushed his head down on the table ledge and pulled his right arm behind him and placed her weight on him. And he was choking." (Rodriguez Dep. 24:12-19, July 26, 2005.)  "[S]he really hurt this child. I was afraid for this child." (Mort Dep. 31:5-8, July 26, 2005.)  "He had pinched her, and she got mad, and she laid him over his desk with – put an arm behind his back, and laid her body down with his head turned. And his neck was against the edge of the desk, and his lips were turning purple, and his eyes were bulging out. I just really got scared. He's a very small framed child, and it – it scared me. And I – I went over and pulled her off, and she got mad and said that this was her class, and she could run it whatever the fucking way she felt." (Id. 31:21-32:5.)

[5] Jennifer Rodriguez was Garrett's aide for the 2003-04 and 2004-05 school years, though Garrett was removed in October of 2004 after her aides reported the most violent of Garrett's assaults to Alexis Agosto, an assistant principal. (Rodriguez Dep. 9:4-8.) Sabrina Mort was Garrett's aide from August to December of 2002 and during the fall of 2004. (Mort Dep. 15:17-23.) She initially began working as an assistant in the autistic department in 1997. (Id.)

teacher's aides, agree with Garrett that her hitting of J.V. was, on this occasion, accidental. Under the version of events in her summary judgment memorandum, Garrett does not dispute, deny, or explain attempting to hit J.V. on the back of the head, but she justifies the action as one of redirection, and to that extent, the only part of the hit that seems "accidental" is either the fact that the hit landed on his face rather than the back of his head, or that she struck him with enough force to leave a mark. (Rodriguez Dep. 56:13-18 ("[I]t left a print on his face . . . .").) No matter the circumstances, it is undisputed that Garrett did hit J.V. in the face on that occasion.

On another occasion, in response to J.V.'s screaming, Garrett "smacked him in the back of the head." (Id. 33:11-14; 57:17-23; 97:2-3.) The contact was so forceful that Rodriguez heard it. (Id.) No one asked Garrett about this incident in her deposition, but in her motion Garrett described it as an effort to redirect J.V. from being disruptive. (Doc. 79 at 3-4.)

J.V.'s mother noticed bruising near J.V.'s thumbs. (Ortiz Aff. ¶ 17.) She later learned that an aide had reported that Garrett bent children's thumbs backwards as a form of restraint and that the force of the restraint left black and blue bruising similar to the bruising

---

Two other classroom aides, Sabine Nowik and Michelle Alessandri, also witnessed Garrett's abusive behavior. Nowik worked at South Seminole Middle School from 2000 to 2004, starting as Garrett's assistant and then moving over into the classroom of Lynn Tacher, the teacher replaced by Lisa Callovi. (Nowik Dep. 13:11-12; 25:19-27:5; 41:1-42:3, Apr. 4, 2006.) Alessandri worked there from August of 2000 until November of 2002 as an assistant with Garrett first and then Tacher. (Alessandri Dep. 9:4-14, Apr. 4, 2006.)

Richard Mossman was the principal and Josephine Opisso, the assistant principal; they were replaced by Robin Dehlinger and Agosto, respectively. (Nowik Dep. 16:1-14.)

found on J.V. (Id.; Byerly Report at 3 ¶¶ 4, 5.[6]) Garrett admitted that she engaged in "thumb folding" but explained it as a legitimate restraint technique that she learned during the Crisis Prevention Intervention class. (Garrett Dep. 124:21-125:21.)

J.V. also suffered through profanity-filled verbal assaults and emotional abuse, and he observed Garrett's abuse of his autistic classmates. (Mort Dep. 44:1-2; 44:21-46:6; 47:6-25; Rodriguez Dep. 17:8-11; Nowik Dep. 60:3.) Based on the time frame of events and the aides' testimony, J.V. witnessed Garrett's treatment of the other students, and although Garrett urges the Court to disregard the allegations concerning other children, she does not argue that J.V. was not present during the time that those events are said to have occurred. Dr. Vollmer, Plaintiff's expert, opined that J.V.'s exposure to Garrett, an aggressive and abusive behavioral model, was harmful to him. (Vollmer Aff. ¶¶ 5(b), (d), (f), 7, 8.) Garrett admits that such exposure to violence would be detrimental to any child, but she denies the allegations and she denies ever disciplining or punishing any child for any reason. (Garrett Dep. 47:4-10; 102:1-19; 132:22-133:5; 130:20-132:21.)

Garrett's assistants and peers paint a far different picture. "I have seen spanking, I've seen hitting in the back of the head, I've seen a closed fist to the back of the head, I've seen improper restraint, and I've seen her choke a kid." (Rodriguez Dep. 17:4-7.) Garrett closed

---

[6] John Byerly, SCSB's Professional Standards Investigator, investigated Garrett on at least three occasions: first, at Indian Trails Middle School in 2000; second, at South Seminole following the receipt of sexually explicit material taken allegedly from Garrett's website; and third, in 2004, after she was removed from her position. Byerly drafted two investigative summaries regarding the first and third incidents, the latter of which was incomplete due to Garrett's resignation. The reference to the bruising and Garrett's use of this restraint technique is contained in Byerly's 2004 report, which is an attachment to Byerly's deposition at Docket 75-10, filed by Seminole County School Board.

the bathroom door on children in time-out[7] – a practice that was reported by a parent to Assistant Principal Agosto.[8] (Id. 79:22-80:16.)  In response to her violence, children were shocked, fearful, and agitated, and some would cry. (Id. 17:15-23.) Rodriguez reported that there was insufficient training for working with autistic students and that there were no clear policies in place for dealing with abuse committed internally within the school.  (Id. 35:4-24.) The lack of an abuse policy was confirmed by Sabine Nowik.  (Nowik Dep. 48:15-49:14.)

According to witnesses, Garrett often provoked the children into having behaviors[9] just to restrain them or put them in time out.  (Id. 55:10-56:21; 58:11-24.)  She instilled fear in them, (id. 60:11-13), elbowed them when they stood too close to her, sometimes with enough force to knock them back a few steps (id. 67:21-68:14; Alessandri Dep. 50:20-51:1, Apr. 4, 2006), threw them into chairs, pushed them up against walls, and held them down

---

[7] Misuse of the bathroom for time-outs was also suggested in Nowik's testimony:
   Q: Were there times when Garrett would go into the bathroom
   and close the door?
   A: With the students?
   Q: Yes.
   A: Yes.
   Q: And would you hear the children cry out?
   A: Yes.
  (Nowik Dep. 63:4-10.)

[8] Garrett denies ever having closed the door on students in "cool-down" and reports that if the door was ever closed, it was because a student walked by and shut it while she was in there checking on a child in timeout. (Garrett Dep. 136:15-137:16; Feb. 15-16, 2007.)

[9] "The use of 'behaviors' in the plural seems to be a term of art in connection with the actions of autistic children." Fessler v. Giles County Bd. of Educ., No. 1-00-0120, 2005 WL 1868793, at *5 n.2 (M.D. Tenn. July 27, 2005).  In most of the depositions, the mannerisms and actions of autistic children have been termed "behaviors," and engaging in those actions has been called "having behaviors."

in front of other teachers and school administrators (Nowik Dep. 80:14-19). Garrett restrained students improperly – pushing their arms too hard and causing them pain (id. 73:10-21), putting them on the floor, holding their arms behind their backs, and sitting on them (id. 74:17-24) – and the restraints were neither documented nor reported because school policy did not require it (id. 75:20-76:1; but see Opisso Dep. 79:9-18; 81:11-16; 82:1-4, Apr. 18, 2006).

There were other reported incidents. Once, Garrett ordered a child to clean up his vomit, and when he resisted, she pushed his head towards the floor to make him comply. Although she did not see it directly, Nowik believes that Garrett pushed the boy's face into the mess because vomit was smeared on his face when he arose. (Nowik Dep. 60:19-25; 119:1-8; 61:6-9; 76:21-25.) Garrett neglected to test a diabetic child's blood sugar levels regularly and one time he went into shock and had seizures (id. 78:17-25). In response to a child not doing his work, Garrett pinned him against a wall, rubbing against him with her body and taunting "Cry for Mama." (Id. 77:6-9; Tacher Aff. ¶10.)[10] Garrett also violently brushed a child's hair, causing the girl's head to snap back and her to cry. (Nowik Dep. 77:12-13; 77:17-78:4; Alessandri Dep. 64:5-66:7.) All of these events were reported to Assistant Principal, Josephine Opisso.

---

[10] "And he was crying . . . . She told him to stand in front of the bathroom, facing the bathroom door, with his hands up to where his back was facing us. Then she went over there and turned around and pressed her body against his and they were back to back. And then she was telling him, rubbing up and down, "Come on. Cry for Mama. Cry for Mama. Come on, cry." (Alessandri Dep. 77:10-78:9; 78:10-14). Based on the timing of this event, it does not seem that J.V. witnessed it. This incident, however, is probative of her general treatment of the children in her class.

Likewise, Michelle Alessandri reported Garrett's misconduct to Opisso, but no action was taken. (Alessandri Dep. 34:18-35:12; 39:13-20; 68:8-11.) On one occasion, Alessandri discovered that a child who had been alone with Garrett had chipped his front teeth against his desk. (Id. 37:8-18; 70:21-72:21.) Garrett seemed anxious and had her hand on the back of the boy's head when Alessandri entered the room; she believes that Garrett slammed his head into the desk. (Id.; see also Nowik Dep. 77:1-5.) The teacher's explanation of the injury was "[o]h, he must have slammed his – got mad and slammed his head on the desk." (Alessandri Dep. 71: 12-17.) Although she did not witness it, Alessandri doubted that the frail child was strong enough to injure himself that severely.[11] (Id. 37:8-18; 70:21-72:21.) Garrett once provoked and taunted a child who had broken his glasses until his level of agitation required that he be restrained. Garrett put his arms behind his back and "slammed him down." (Id. 66:20-67:22.) Alessandri also presented Assistant Principal Opisso with evidence of prior abuse – a police report wherein Garrett was accused of smashing a child's head into a desk, breaking her glasses, (id. 74:17-75:2; 76:9-17).

Lynn Tacher, J.V.'s former teacher who was replaced by Lisa Callovi, stated that the administration referred to Garrett's classroom as the "little factory," (Tacher Aff. ¶ 6), and she often heard crying and screaming coming from inside. (Id. ¶ 7.) Tacher witnessed Garrett push her large frame against the children as a form of intimidation (id. ¶ 8), and repeatedly press a boy's face in between her breasts (id. ¶ 9). At some point, Tacher

_____

[11] Alessandri states that she did not accuse Garrett outright in her written report to Opisso, but she did express that she did not think the child had the ability to do that to himself. (Id. 72:8-11.)

-8-

learned that the police had investigated Garrett on suspicion of abuse at her prior school and she discussed the matter with both Nowik and Alessandri. (Id. ¶ 15.) When Garrett learned of the conversation, she threatened Tacher and warned her not to discuss those matters any further. (Id.)

Mort, an intermittent aide of Garrett's, observed only verbal abuse of the children during her initial tenure with her from August to December of 2002. (Mort Dep. 14:3-6.) When she returned in the fall of 2004 during the time that J.V. was a half-time student of Garrett's, her behavior had worsened. "I would see them get slapped on their rear, she would push them, she would holler at them, she would put them in timeout, and they would cry for a while. They were – she would restrain them." (Id. 21:8-11; see also id. 21:12-21; 17:16-18:10; 18:16-18; 104:19-105:17.) Mort informally reported to Assistant Principal Agosto that Garrett was too rough at least three times during the fall of 2004, prior to Garrett's final assault. (Id. 30:11-14; 33:7-24; 85:14-86:17.) Additionally, she told Agosto that Garrett had twisted Mort's son's arm. (Id. 70:9-71:3.) Before working with Garrett, Mort told former Assistant Principal Opisso that she saw Garrett slap a child's hands in the lunchroom. (Id. 35:15-37:9; 85:14-86:17.) Her reports were either dismissed or not taken seriously. (Id. 52:14-53:1.)

Nowik also reported Garrett's inappropriate behavior to Opisso, in both verbal and written form, but nothing was done in response. (Rodriguez Dep. 25:2-23; Nowik Dep.9:12-14; 53:3-8.) Tacher stated that Opisso was protective of Garrett and silenced Tacher when she tried to raise concerns about Garrett. She further stated that the school administrators all knew of Garrett's classroom demeanor. (Tacher Aff. ¶¶ 11-15.)

The school finally took action in late October, 2004, when Garrett choked one of her autistic students until he turned purple and his eyes bulged. Rodriguez and Mort complained to Assistant Principal Agosto (Rodriguez Dep. 23:11-16; 24:5-7), who replied "we have had our suspicions all along." (Id. 27:1-3; see also Mort Dep. 39:5-11.) Law enforcement removed Garrett from the classroom the following week. Garrett denies that the incident occurred, but she has since been found guilty of this charge in the state criminal proceedings. She states that all four aides are lying about her for various reasons.[12] (Garrett Dep. 189:9-190:25.)

## II. Summary Judgment Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of establishing that no genuine issues of material fact remain. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997). "The

---

[12] Garrett suspects that Alessandri and Nowik are lying because they want revenge. Garrett claims that she removed both of them from her classroom for inappropriately teasing the students. (Id. 191:7-8; 193:25-194:21.) As for Mort and Rodriguez, Garrett claims that they are shifting the blame from themselves onto her because a parent called Assistant Principal Agosto, complaining that they had confiscated her son's magazine and placed him in time out. (Id. 191:15-193:15.)

evidence presented cannot consist of conclusory allegations or legal conclusions." Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991); see also Fed. R. Civ. P. 56(e) (providing that the nonmovant "must set forth specific facts showing that there is a genuine issue for trial").

In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. Some degree of factual dispute is expected, but to defeat a motion for summary judgment the factual dispute must be material and genuine. That is, the factual evidence must "affect the outcome of the suit" and must be "such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

"Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." Sawyer v. Southwest Airlines Co., 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing Anderson, 477 U.S. at 250-51). "'In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial.' Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" Id. (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988) and Anderson, 477 U.S. at 251-52).

### III. Merits of Defendant's Motion

Defendant makes the following arguments in support of her motion for summary judgment: (1) that the physical contacts with J.V. were accidental, unforceful, and done in an attempt to redirect him and that the verbal assaults were not directed at J.V.; (2) that she has immunity from suit as a public employee acting within the scope of her employment pursuant to section 768.28(9), Florida Statutes (2001) for the state law claims[13]; (3) that she is entitled to qualified immunity from the § 1983 claim; (4) that liability must lie with either the School Board or herself, but that both parties cannot each be liable under the authority of Johnson v. State Department of Health and Rehabilitative Services, 695 So. 2d 927, 930-31 (Fla. 2d DCA 1997); (5) that section 1006.11, Florida Statutes, allows and even under certain circumstances requires a teacher to touch or restrain a child; (6) that J.V. did not suffer any deprivation of his substantive due process rights; (7) that J.V. has not suffered any cognizable injury to satisfy Article III standing; and (8) that because many of the allegations concern other children, she contends her acts against J.V. were not "outrageous"

---

[13] Although Defendant initially claims immunity under section 768.28(9), Florida Statutes – the general limited waiver of sovereign immunity for tort actions asserted against the state – as the basis for shielding her from § 1983 liability, she advances a qualified immunity analysis. (Doc. 79 at 6-7.) Section 768.28(9), which is aimed at tort law, has no bearing on her § 1983 liability, though it may be raised as a defense to the state law claims. In defense of the state law claims, however, Defendant only relies on a teacher's "right" to use force against students, which she discerns arises from section 1006.11, Florida Statutes, as the basis for her entitlement to judgment as a matter of law. Though she does not adequately argue immunity under § 768.28(9) for the state tort claims, if she had, summary judgment is, nonetheless, inappropriate because the allegations against her fall within the exception of § 768.28(9), which provides for personal liability if the employee "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." Fla. Stat. § 768.28(9).

-12-

as required to state a claim for intentional infliction of emotional distress.

Three of these arguments are easily dismissed. First, the argument that the state law claims are proscribed by section 1006.11, which provides that a teacher will not be liable for any use of reasonable force effected to maintain a safe and orderly learning environment if in conformity with school board rules, is without merit. Fla. Stat. § 1006.11 (2006). Plainly, the statute permits reasonable force in certain circumstances; it expressly excludes "excessive force or cruel and unusual punishment." Id. Defendant has not been sued because she used reasonable force; indeed, the basis of all of the claims against her is that she used excessive force, exceeding the appropriate reaction to any of the students' conduct. Thus, Defendant's claim that she is entitled to summary judgment on the state law assault and battery claims because of the "right" afforded teachers under section 1006.11, Florida Statutes, is rejected.

Second, Defendant's argument that J.V. has suffered no injury, and thus cannot establish the requisite standing to maintain the suit, has also been asserted, treated, and rejected in this case and the companion cases on respective motions to dismiss. (See Doc. 42 at 18 & ¶¶ 24-29 (arguing that the lack of physical injury defeats the due process claim)); see also J.A. ex rel. Abelove v. Seminole County Sch. Bd., No. 6:05-cv-975, 2005 WL 3093407, at *2, 4 (M.D. Fla., Nov. 18, 2005); A.B. ex rel. Baez v. Seminole County Sch. Bd., No. 6:05-cv-802, 2005 WL 2105961, at *5 (M.D. Fla. Aug. 31, 2005). Though a plaintiff can defeat a challenge to his standing in a motion to dismiss by generally alleging facts showing an injury, a plaintiff must come forward with evidence of specific facts establishing an injury when standing is challenged in a summary judgment motion. See Bischoff v. Osceola

-13-

County, 222 F.3d 874, 878 (11th Cir. 2000); Wilson v. State Bar of Ga., 132 F.3d 1422, 1427 (11th Cir. 1998). Defendant's standing argument is rejected again at this stage of the proceedings because J.V. has alleged an injury – concrete and specific – sufficient to satisfy Article III's standing requirements. J.V. has set forth specific evidence, detailed above, through deposition testimony and affidavits, which the Court takes as true, demonstrating an actual injury-in-fact sufficient to establish standing

Finally, Garrett's argument that she and the School Board cannot be simultaneously liable under § 1983 is without merit. Garrett has misread the holding in Johnson, wherein the court upheld the § 1983 claims against both the individual defendants and the governmental entity, 695 So.2d at 928-29; it was only with respect to the common law tort claims that the court addressed double liability. Id. at 930. Even in the state tort law context, however, the court held that a plaintiff could pursue each avenue of liability under alternative theories. Id. Defendant's reliance on sovereign immunity for state tort law claims, and her argument that there can be no double liability for tort claims, is inapplicable to the § 1983 claims raised against her. All that remains then is Defendant's assertion of qualified immunity for the § 1983 claim and her claim that her conduct was not outrageous under the intentional infliction of emotional distress count.

## Section 1983

Defendant Garrett asserts qualified immunity as to Plaintiff's § 1983 claim, arguing that J.V. suffered no constitutional deprivation. Government officials engaged in discretionary duties have the benefit of qualified immunity when "sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional

-14-

rights of which a reasonable person would have known." Lee v. Ferraro, 284 F.3d 1188, 1193-94 (11th Cir. 2002) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Qualified immunity is not just a defense to liability, but it is also a defense from suit and so it must be determined at the earliest possible stage of litigation. Id. (citing GJR Invs., Inc. v. County of Escambia, 132 F. 3d 1359, 1370 (11th Cir. 1998)).

A public official must first establish that she is entitled to the benefit of qualified immunity by proving that "[s]he was acting within the scope of h[er] discretionary authority when the allegedly wrongful acts occurred."[14] Id. (quoting Courson v. McMillian, 939 F.2d 1479, 1484 (11th Cir. 1991)). Once the defendant meets that burden, the plaintiff must then "show that qualified immunity is not appropriate" under the two-part test articulated in Saucier v. Katz, 533 U.S. 194, 201-02 (2001). The first question under that test is "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Id. at 201. If no constitutional violation is revealed after considering the facts most favorably to the plaintiff, the defendant is entitled to summary judgment. See Baltimore v. City of Albany, 183 Fed. Appx. 891, 896 (11th Cir.

---

[14]   Defendant Garrett's claim of qualified immunity is inadequate because she conflates state sovereign immunity with qualified immunity and because she fails to claim that she was acting within her discretionary authority to show she is entitled to the defense. Garrett focuses on Plaintiff's burden under § 1983 rather than set forth the qualified immunity argument.  Garrett's citations to Harlow v. Fitzgerald, 457 U.S. 800 (1982), Anderson v. Creighton, 483 U.S. 635 (1987), and Poe v. Haydon, 853 F.2d 418 (6th Cir. 1988), however, suggest that she is attempting to assert qualified immunity. Disciplining children certainly falls within the job description of a teacher, and so discipline is usually a discretionary function entitling the teacher to raise the qualified immunity defense. See Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1265-67 (11th Cir. 2004). The Court will assume that Garrett properly raised the issue of qualified immunity.

2006); see also Garrett v. Athens-Clarke County, 378 F.3d 1274, 1280-81 (11th Cir. 2004). If the facts do reveal a constitutional violation, the Court must proceed to the second step of the Saucier inquiry and ask whether, at the time of the violation, the official "would have realized the acts violated already clearly established federal law." Id. (quoting Garrett, 378 F.3d at 1278-79).; see also Kirkland ex rel. Jones v. Greene County Bd. of Educ., 347 F.3d 903, 905 (11th Cir. 2003); cf. Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 250-53 (2d Cir. 2001) (construing the absence of case law in that circuit recognizing the substantive due process right in the public school setting as "a strong indication that the right to be free from excessive force is so well-recognized and widely observed by educators in public schools as to have eluded the necessity of judicial pronouncement").

As explained below, Plaintiff has presented sufficient disputed material facts that could support a jury finding that Garrett's actions were conscience-shocking, constituting excessive force in violation of J.V.'s substantive due process rights. Furthermore, this right was clearly established at the time of the violation and thus Defendant is not entitled to qualified immunity.

A. Constitutional Deprivation

The Fourteenth Amendment's substantive due process right protects persons "from the arbitrary exercise of governmental power, and to prevent governmental power to be used for the purpose of oppression." A.B., 2005 WL 2105961, at *5 (citing Daniels v. Williams, 474 U.S. 327, 331 (1986)). Embodied in this right is the right to be free from excessive force at the hands of a government official. Dockery v. Barnett, 167 F. Supp. 2d 597, 602 (S.D.N.Y. 2001). To determine if a constitutional deprivation has occurred that would

-16-

subject a government actor to § 1983 liability, "the court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Thomas v. Bd. of Educ. of West Greene Sch. Dist., No. 2:04-cv-1661, slip op., 2006 WL 3538960, at *2-3 (W.D. Pa. Dec. 7, 2006) (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)). The leading case of Hall v. Tawney, 621 F.2d 607 (4th Cir. 1980), adapted the general standard to the context of corporal punishment in a school setting, concluding that "the substantive due process inquiry . . . must be whether the force applied caused injury so severe, was so disproportionate to the need presented, and was so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." Id. at 613; see also Neal ex rel. Neal v. Fulton County Bd. of Educ., 229 F.3d 1069, 1074-76 (11th Cir. 2000).

These factors apply to the facts of this case with some difficulty given that the victims are unable to communicate and that they have significant preexisting mental and emotional disabilities which require special care. Plaintiff's developmental disability must be considered in determining the need for force, the extent of injury, or the maliciousness of Garrett's actions. See Dockery, 167 F. Supp. 2d at 604 ("[T]he issue is better reserved for a jury – especially considering that . . . plaintiffs in this case are autistic children, who are more vulnerable and less capable of communicating than other children."); Roe ex rel. Preschooler II v. Nevada, 332 F. Supp. 2d 1331 (D. Nev. 2004) (denying motion to dismiss

-17-

§ 1983 claims against teacher who allegedly slapped an autistic, non-verbal child or made him slap himself, slammed the child into a chair, and made him walk from the bus to the classroom without shoes); see also Sutton v. Utah State Sch. for Deaf & Blind, 173 F.3d 1226, 1240 (10th Cir. 1999) (considering victim's severe disabilities in determining a principal's § 1983 liability for failure to implement policies to protect students from each other); cf. Fessler v. Giles County Bd. of Educ., No. 1-00-0120, 2005 WL 1868793 (M.D. Tenn. July 27, 2005). The conscience-shocking threshold is more quickly reached in cases where the victim is particularly vulnerable to abuse and is otherwise defenseless.

### 1. Need for the Application of Force

While some of the incidents of abuse attributed to Garrett were in response to a student's misbehavior, and thus arguably disciplinary, others were not. Garrett's assistants have testified that she often provoked children and then used excessive and unnecessary restraint to subdue them. Other "punishments"[15] were in response to normal autistic behaviors including screaming, arm-flapping, and self-stimulation, which do not necessarily warrant the use of physical force. Reasonable people may disagree as to when – if ever – corporal punishment is necessary in a school setting. In assessing the appropriateness of Garrett's use of force, it is necessary to consider the particular vulnerability of the children, the fact that the conduct being addressed was normal among autistic children, as well as

---

[15] "I don't consider this punishment. It's child abuse, yes. But she wasn't punishing him for something. He was not learning a lesson. You know, he would still do it." (Nowik Dep. at 72:24-73:2.)

-18-

Garrett's actual conduct. Under the circumstances of this case, a jury could determine that the force applied was disproportionate to the need for discipline.[16]

2. Extent of Injury Inflicted

While recognizing that three factors control the analysis, Garrett bases her entire argument – that Plaintiff falls short of the "shocking the conscience" standard – on the contention that J.V. did not suffer a physical injury. (Doc. 79 at 9-11.) It has already been determined, however, that Plaintiff has set forth evidence tending to establish an injury suffered at the hands of his teacher. His injuries were physical, mental, and emotional, and even though his injuries may be more difficult to quantify than those presented in the average case, that does not mean they are nonexistent. Plaintiff has documented J.V.'s behavioral regression and his subsequent over-medication through his pediatrician. Plaintiff claims that J.V.'s increase in and his reluctance to go to school are due not only to Defendant's direct abuse of him but also to the environment of terror to which he was subjected, witnessing Garrett harming others in proximity to him. See Dockery, 167 F. Supp. 2d at 603 (documenting the severe psychological injuries suffered by autistic children from the use of physical force over a year's time including an increase in violent and self-injurious conduct, the onset of compulsive masturbation, and the need to be placed on anti-

_____

[16] The Court does not doubt that physical restraint is sometimes necessary to protect an autistic child from self-injurious behavior or to prevent him from hurting others. Plaintiff has alleged, and the aides have testified, however, that Garrett improperly physically restrained students by causing them pain and by pressing her large frame against them and also that she provoked and agitated students until they became so upset that they needed to be restrained. At least some of her restraints had no disciplinary or protective aim; rather, they were necessary only because of Garrett's own actions.

-19-

psychotic medication for uncharacteristic displays of violence); <u>Fessler</u>, 2005 WL 1868793, at *15 (distinguishing <u>Dockery</u> in a case where the autistic victim was kicked and knocked down once and where the child had already displayed problem behaviors daily and even showed some behavioral improvements after the incident). Though identifying a discrete psychological injury in a child who already suffers from autism is difficult, the record evidence shows that J.V.'s behavior declined, his need for medication increased, and he tried to avoid attending school.

There is also record evidence that at least one of Garrett's blows left a mark on J.V.'s face. His mother also reported bruising around his thumbs, and Garrett was known to bend her students' thumbs back as a restraint. <u>See</u> <u>Dockery</u>, 167 F. Supp. 2d at 603-04 (listing physical injuries, including grabbing a child "with enough force to leave a hand print, a fingernail mark, a bruise, or to cause tears"). Though the physical injuries alleged by J.V. are far less severe than those suffered by the plaintiff in <u>Neal</u>, 229 F.3d at 1076 (recounting horrific result of a coach hitting student with a weight lock, thus dislodging and destroying the student's eyeball), a constitutional violation is determined on a case-by-case basis and the degree of injury must be considered relative to both the need for resorting to physical force and the vulnerability and helplessness of the plaintiff. While the question may be a close one, where the victim is unable to tell anyone all that Garrett may have done to him and where he requires more care than most children, summary judgment is imprudent. Against this backdrop of unique facts and because J.V. is developmentally disabled, the degree of injury required to constitute a constitutional deprivation is less and the use of

unnecessary and excessive force is particularly malicious. As was the case in <u>Dockery</u>, the issue here is one for a jury. <u>See</u> 167 F. Supp. 2d at 604.

Garrett urges the Court to disregard the allegations of abuse directed at children other than J.V. in this motion and in her Motion in Limine (Doc. 110), in which she argues that the allegations concerning other children amount to improper character evidence. Relying principally on <u>Hiep v. Clark</u>, 90 Civ. 3196, 1996 U.S. Dist. LEXIS 21206 (S.D.N.Y. Sept. 9, 1996), her evidentiary argument is that J.V. offers the evidence to prove that she acted in conformity with those prior bad acts in her treatment of J.V. <u>See</u> Fed. R. Evid. 404(b). <u>Hiep</u> is inapposite. <u>Hiep</u> held that while the officer's prior bad acts were admissible to show the municipality's custom, practice, and policy, the acts were inadmissible against the individual defendants to show that they acted in conformity with that prior conduct on the relevant occasion. 1995 U.S. Dist. LEXIS 21206, at *2-4. Here, however, Plaintiff does not offer the testimony regarding Garrrett's abuse of other children as evidence that she also abused J.V. Rather, Plaintiff contends that Garrett's abuse of his classmates constituted a form of abuse against him. Dr. Vollmer, Plaintiff's expert, supports this conclusion and opines that exposing any child to an aggressive model is harmful and that children who witness abuse are also victims of abuse. (Vollmer Aff. ¶ 5(f); Vollmer Aff. Ex. at ¶¶ 1, 10 (Doc. 95-2).)

Plaintiff's argument is persuasive. Though there is some evidence that many of the children seemed to withdraw into themselves and ignore their surroundings, the Court cannot conclude that J.V. was unaffected by the severe treatment of his classmates, particularly when he himself was physically harmed by Garrett. In a classroom of less than ten students, all of whom are autistic, the regular use of unnecessary violence and the

-21-

consistent barrage of verbal assaults could have created a harmful and perhaps emotionally abusive environment. When that environment is coupled with evidence of direct physical assault and purposeful neglect, the Court must conclude that whether a constitutional violation occurred is one for a jury. Garrett's direct abuse of one child was a different kind of abuse for another. An absurd result might follow, particularly in this setting, if Garrett's actions were considered in a vacuum and Garrett benefitted from the fact that she mistreated all of the children rather than confining her abuse to one unfortunate victim.

3. Whether Force was Applied in Good Faith to Maintain and Restore Discipline

The final factor to be considered in determining whether a constitutional violation has occurred is whether the force was applied in good faith or was "inspired by malice or sadism . . . amount[ing] to a brutal and inhumane abuse of official power." See Dockery, 167 F. Supp. 2d at 604 (quoting Hall, 621 F.2d at 613). While some level of physical restraint may have been appropriately applied in a good faith attempt to restore order to the classroom, here, the allegations are that excessive force was used in response to relatively benign behaviors or as a result of Garrett's intentional provocation and that the force used caused the children pain.

Had Garrett only engaged in an isolated incident of aggression that did not result in serious injury, one might reasonably conclude that Garrett had been afflicted with the "unwise excess of zeal" that Hall warned might not amount to a constitutional violation. 621 F.2d at 613. There is evidence, however, that Garrett persistently exposed these children to a hostile, violent, and frightening learning environment. Evidence that she ridiculed

children and provoked and injured them could belie any claim that she acted in good faith. A jury could conclude that Garrett's actions were inspired by malice.

B. Whether the Law was Clearly Established

The right to be free from excessive and arbitrary corporal punishment in a school context is clearly established under the precedent of the United States Supreme Court and the Eleventh Circuit Court of Appeals. Ingraham v. Wright, 430 U.S. 651, 672-74 (1977); Neal, 229 F.3d at 1075; Kirkland, 347 F.3d at 904. If J.V. is found to have suffered a constitutional violation, Garrett is not entitled to qualified immunity because physical assaults, routine intimidation, and verbal assaults constitute excessive punishment, clearly established as forbidden by the Fourteenth Amendment.

Intentional Infliction of Emotional Distress

The tort of intentional infliction of emotional distress has four elements: "(1) the wrongdoer's conduct was intentional or reckless . . . (2) the conduct was outrageous . . . (3) the conduct caused emotional distress; and (4) the emotional distress was severe." Brown v. Brown, 800 So. 2d 359, 362-63 (Fla. 4th DCA 2001). Garrett claims that she is entitled to judgment on this claim because the conduct directed towards J.V. was not outrageous but consisted only of two attempts at redirection which were not violent or forceful. (Doc. 79 at 17-18.) Striking a developmentally disabled child in the head and face for screaming at least pushes the bounds of decency, if it does not fully traverse them. Evidence of constant verbal assaults, provocations, taunts, painful and violent physical restraints and assaults – even if directed against other helpless children – support Plaintiff's claim that Garrett's conduct was outrageous, especially considering the small and isolated context of the ESE

-23-

classroom setting. A jury could reasonably conclude that Garrett's actions against non-communicative and defenseless children were "odious and utterly intolerable in a civilized community," id. at 362.

## IV. Conclusion

Plaintiff has presented sufficient evidence to survive summary judgment on the question of whether J.V. was deprived of his substantive due process right to be free from excessive and arbitrary corporal punishment. The right to be free from such force is clearly established in this Circuit. Thus, Defendant Garrett is not entitled to qualified immunity on the § 1983 claim. Additionally, if Plaintiff establishes at trial that Garrett used excessive physical force, Garrett is not entitled to immunity as to the state law claims. Finally, Plaintiff has presented evidence creating a jury question as to whether Garrett's conduct was sufficiently outrageous to amount to intentional infliction of emotional distress.

In accordance with the foregoing, it is ORDERED and ADJUDGED that Defendant Garrett's Motion for Summary Judgment (Doc. 79) is hereby **DENIED**.

**DONE** and **ORDERED** in Chambers, Orlando, Florida this __2 0__ day of March, 2007.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Party

-24-